**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF ALL PETROLEUM-PRODUCT CARGO ONBOARD THE M/T PEGAS WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9256860** | **CASE NO. 22-sz-11**<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Cindy Burnham, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant. I have been a Special Agent with the FBI since April 2006. Since that time, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, and counterproliferation. During my work with the FBI, I have executed, or participated in the execution of search warrants and have seized evidence of criminal violations. I have conducted and participated in other investigations related to violations of U.S. export laws and regulations, and sanctions violations. I have been involved in investigations involving the illegal export of controlled items, as well as investigations involving the illegal use of the U.S. financial system to facilitate petroleum sales for the benefit of the Government of Iran.

2.      Based upon my training and experience, I am familiar with the methods of operation employed by subjects in national security investigations to obfuscate their involvement in transactions for the purpose of circumventing sanctions imposed by the United States and the United Nations ("UN").

3.      I have been one of the case agents in this investigation, which is worked jointly with Homeland Security Investigations. The information obtained over the course of the investigation has revealed designated entities are violating U.S. laws and regulations by laundering U.S. dollar payments by sending wire transfers through correspondent accounts at U.S. financial institutions to facilitate purchases and related transactions for the Islamic Revolutionary Guard Corps ("IRGC") and the Qods Force of the Islamic Revolutionary Guard Corps ("IRGC-QF"), a designated terrorist organization. During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents, law enforcement officers, and partners at other U.S. Government agencies who have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein.

## I.     PURPOSE OF AFFIDAVIT

4.      This affidavit is made in support of a seizure warrant for all petroleum product (the "Target Cargo") onboard the M/T PEGAS (International Maritime Organization ("IMO") No. 9256860) (the "PEGAS"), which is estimated to be approximately 778,436 barrels of crude oil.

5.      As further described herein, the Target Cargo was obtained from sanctioned Iranian entities, as follows:

   a.   On or about September 24, 2020, the M/T Rima (IMO No. 9150377) received her cargo from the M/T Stream (IMO No. 9569633), a vessel owned by the National Iranian Tanker Company (NITC), U.S. Department of the Treasury-designated

entity. The transfer occurred at the Kharg Island, Iran anchorage.[1] There is probable cause to believe that the Kharg Island terminal used by the Rima and Stream is owned and operated by the National Iranian Oil Company ("NIOC"), a U.S. Department of the Treasury-designated entity, as is the petroleum product obtained therefrom.

b.  Further, there is probable cause to believe that the Rima is operated by IRGC-QF. The Rima was formerly known as the Nautic and Gulf Sky. Based on information gathered in a prior unrelated investigation, IRGC-QF associate Amir Dianat ("Dianat") owns Taif Mining Services LLC ("Taif Mining"), which in turn owns the Rima.  Both Dianat and Taif Mining have been designated by the Department of the Treasury.  Based on my training and experience I believe that a standard due diligence check on the Rima would have alerted the owners of the PEGAS its links to Dianat and the IRGC-QF.

c.  On or about August 17, 2021, the Rima engaged in a ship to ship transfer of crude oil with the PEGAS in Iranian territorial water. The PEGAS remains laden with the same crude oil.

6.  The Target Cargo is a source of influence over NIOC, Dianat, Taif Mining, IRGC, and IRGC-QF within the meaning of 18 U.S.C. § 981(a)(1)(G)(i). In transferring the Target Cargo for the purposes of sale, NIOC provided or attempted to provide resources to IRGC and IRGC-

---

[1] As referred to herein, the anchorage is the area outside a port where vessels are permitted by the port to anchor.

QF, in violation of 18 U.S.C. § 2339B(a)(1).  Any conveyance of the Target Cargo is also an attempt to provide resources to IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

7.      The Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i).

8.      There is probable cause to believe that the Target Cargo is subject to seizure and forfeiture as assets of, or assets that afford a source of influence over, a foreign terrorist organization.

## II.   <u>STATUTORY BACKGROUND</u>

### A.   IRGC and the IRGC-QF

9.      On October 25, 2007, the Department of the Treasury designated the IRGC-QF pursuant to Executive Order (E.O.) No. 13224 for providing lethal support to multiple terrorist organizations. That same day, the Department of the Treasury also designated the IRGC pursuant to E.O. No. 13382 for its support of Iran's ballistic missile and nuclear programs.

10.     On March 14, 2016, the Department of the Treasury designated the National Iranian Oil Company ("NIOC") pursuant to E.O. No. 13599, which targets the property of the Government of Iran.

11.     On October 13, 2017, the Department of the Treasury designated the IRGC pursuant to E.O. No. 13224 for providing material support to the IRGC-QF, including by providing training, personnel, and military equipment.

12.     On November 5, 2018, the Department of the Treasury designated NIOC's subsidiary, NITC, pursuant to E.O. No. 13599 for its connections to the Government of Iran and its role in the Iranian shipping sector. A previous Department of the Treasury press release noted that NIOC was owned by the Government of Iran through the Ministry of Petroleum, and was responsible for the exploration, production, refining, and export of oil and petroleum products in

Iran. It further noted the close relationship between the IRGC and NIOC. Similarly, a previous Department of the Treasury press release noted that NITC was a Government of Iran entity, which employed various front companies.

13.     On April 8, 2019, the State Department designated the IRGC as a Foreign Terrorist Organization pursuant to E.O. No. 13224. The designation noted that the IRGC actively finances and promotes terrorism, and noted that "the IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign."

14.     On January 23, 2020, the Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies."

15.     On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, designated NITC and NIOC pursuant to counter-terrorism sanctions for their financial support to Iran's IRGC-QF.

16.     According to the Department of the Treasury's statements related to IRGC designations, the IRGC and its major holdings are a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry.

**B.     IEEPA and Russia Sanctions**

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had: undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the

misappropriation of Ukraine's assets. In further response to the actions and polices of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent E.O.s that expanded the scope of the national emergency declared in E.O. 13660 (E.O. 13661 (Mar. 6, 2015); E.O. 13662 (Mar. 16, 2014); E.O. 13685 (Dec. 19, 2014) (collectively, "the Russia Sanctions"). Together, these orders authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine, against officials of the Government of the Russian Federation, against persons operating in the arms or related materiel sector of the Russian Federation, and against individuals and entities operating in the Crimea region of Ukraine. On May 8, 2014, OFAC issued a set of regulations to implement the Russia Sanctions (79 Fed. Reg. 26365, May 8, 2014). *See* 31 C.F.R. part 589, Ukraine-Related Sanctions Regulations (the "Regulations") for details.

18.     The Russia sanctions also block the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

19.     Blocking sanctions against individuals and entities designated pursuant to the Russia sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions by U.S. persons (including U.S. financial institutions) or in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Russia sanctions.

20.     On February 22, 2022, in response to the Russian Federation's 2022 invasion of Ukraine, OFAC sanctioned Promsvyazbank Public Joint Stock Company ("PSB") and its subsidiaries for assisting in "Russia's ability to finance aggression against its neighbors." As explained in the press release regarding the designation, PSB has been "deemed by the [Government of Russia ("GoR")] as a systemically important Russian state-owned financial institution and is Russia's eighth largest financial institution. The GoR nationalized PSB in 2018 and repurposed it to finance the defense industry and service large defense contracts as part of a scheme to assist the government in avoiding new sanctions.  Since its transformation into the Russian state defense bank, PSB has issued billions of dollars in financial support for Russian defense sector companies, and it currently services nearly 70 percent of state contracts signed by the Russian Ministry of Defense (MoD). In addition to supporting the MoD and Russian defense enterprises, PSB provides its banking products, including mortgages, to Russian military personnel. In an effort to insulate itself from U.S. sanctions, the GoR has also tasked PSB with providing credit to entities under U.S. and partner nations' sanctions so that other lenders, namely Sberbank and VTB Bank, can offload the risk of conducting business with sanctioned entities. PSB is reported to be creating a separate currency exchange to service companies targeted by Western sanctions." *See* https://home.treasury.gov/news/press-releases/jy0602.

21.     As part of the designation of PSB, OFAC designated PSB subsidiary, PSB Lizing OOO, and identified five vessels were identified pursuant to E.O. 14024 "as blocked property in which PSB Lizing OOO has an interest," to include the PEGAS (IMO No. 9256860), a Russian-flagged crude oil tanker with a gross registered tonnage of 61991. *See id.*

C.      **Forfeiture Statutes**

22.     This application seeks a seizure warrant under both civil and criminal authorities because the Target Cargo could easily be placed beyond process if not seized by a warrant. The Target Cargo is a liquid petroleum product which is easily transferred. The Target Cargo is currently held onboard the PEGAS, currently located in Greek territorial waters.

23.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Thus, seizure warrants may be obtained outside of the district where the property to be seized is located.

24.     Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic, of an organization engaged in planning or perpetrating any federal crime of terrorism [as defined in 18 U.S.C. § 2332b(g)(5)] against the United States, citizens, or residents of the United States, or their property, are subject to civil forfeiture, as are all assets, foreign or domestic, *affording any person a source of influence over any such entity or organization.* Pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

a.      18 U.S.C. § 98l(a)(l)(G)(i) covers two categories of property relating to any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism [as defined in section 2332b(g)(5)] against the United States, citizens or residents of the United States, or their property: (1) all assets, foreign or

domestic of such individual, entity, or organization; and (2) all assets, foreign and domestic, affording any person a source of influence over the terrorist entity or organization. "That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations." *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL 5853493, at *1 (D.D.C. Nov. 7, 2019).

b.      In a similar case involving petroleum products linked to the IRGC, this court found "that there is probable cause to believe that the Defendant Properties are foreign assets of the [IRGC], a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property, or are foreign assets affording the identified subjects a source of influence over the IRGC." *United States v. All Petroleum-Prod. Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. CV 20-1791, 2020 WL 3771953, at *1 (D.D.C. July 2, 2020).

c.      The terrorism forfeiture authorities apply to a larger class of property than traditional forfeiture authorities. Terrorism-based forfeitures cover the broadest categories of property, as it includes *all* property foreign and domestic of a terrorist organization, irrespective of whether the property has any nexus to the crime or the United States, and all property of a third party that promotes/facilitates the activity of the terrorist organization. *See United States v. Oil Tanker Bearing International*

*Maritime Organization Number 9116512*, 19-cv-1989, 2020 WL 4569424, *4-5 (D.D.C. Aug. 7, 2020) (defining the broad scope of § 981(a)(1)(G)(i)); *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL 5853493, at *1 (D.D.C. Nov. 7, 2019) ("That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations.").

d.      "This court is the sole jurisdiction where such litigation is properly lodged." *One Gold Ring with Carved Gemstone*, 2019 WL 5853493, at *1 (citing 28 U.S.C. § 1355(b)(2)). To the extent that the Target Cargo is seized upon the high seas, this Court additionally has jurisdiction pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b). *See United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-CV-1791, 2020 WL 3771953 (D.D.C. July 2, 2020) ("[T]his Court has venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).").

## III.    IRANIAN PETROLEUM IS AN ASSET OF NIOC AND IRGC-QF

25.      On August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Since this appointment, the Department of the Treasury has noted the close connection between the IRGC and the Iranian petrochemical sector on multiple occasions.

26.      On September 24, 2012, the Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012

("ITRSHRA"), informing Congress that the Department of the Treasury determined that NIOC was an agent or affiliate of the IRGC.

27.     In 2014, the Department of the Treasury further noted that the IRGC's influence had grown within NIOC.

28.     Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia Construction Headquarters, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. During his role as Minister of Petroleum, Qasemi publicly stated his allegiance to the IRGC and the IRGC became increasingly influential in Iran's energy sector. For example, Khatam Al-Anbia obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process. *See* https://ir.usembassy.gov/our-relationship/official-reports/treasury-report-nioc-nitc/.

29.     On June 7, 2019, OFAC sanctioned Persian Gulf Petrochemical Industries Company ("PGPIC") for providing financial support to Khatam al-Anbia. PGPIC is Iran's largest and most profitable petrochemical holding group. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports. Regarding this action, Treasury Secretary Steven T. Mnuchin stated, "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC . . . This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

30.     OFAC has additionally stated that Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund its malign activities throughout the Middle East and that Iran's petrochemical and petroleum sectors are primary sources of funding

for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people. *See* https://home.treasury.gov/news/press-releases/sm885.

31.     OFAC has also noted that crude oil and condensate sold by the IRGC-QF originates with NIOC, and that the IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, NITC vessels have been used in IRGC-QF-run operations. *See* https://home.treasury.gov/news/press-releases/sm767.

32.     OFAC has also noted that a complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil and that in spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter-billion dollars.

33.     OFAC has additionally stated that the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad and that the IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities. *See* https://home.treasury.gov/news/press-releases/sm703.

34.     On October 26, 2020, OFAC stated:

NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran. NITC, a subsidiary of NIOC, is responsible for the transportation of Iranian crude exports. **NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by**

**the IRGC-QF.** The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF.

NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on logistics and pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group representative Viyan Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC. In 2018, OFAC designated Syrian regime-affiliated Qatirji Group for facilitating fuel trades between the Syrian regime and the Islamic State of Iraq and al Sham (ISIS), including providing oil products to ISIS-controlled territory. As of early 2020, the Qatirji Group's Zanganeh continued to work closely with the IRGC-QF to coordinate NIOC's provision of millions of barrels of oil and petroleum products to be shipped to Syria, as well as millions of dollars in payments back to Iran. In mid-2020, Zanganeh continued to act as an intermediary between the IRGC-QF and a Syrian regime-affiliated business, arranging for the funding of the release of a seized vessel and additional shipments of fuel oil.

The Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme. In mid-2019, the Ministry of Petroleum arranged the loading of hundreds of thousands of barrels of oil for shipments to Syria, and in mid-2020 the IRGC-QF and senior regime officials coordinated to use the Ministry of Petroleum to procure U.S. dollars for the benefit of the IRGC-QF.

Furthermore, in order to obfuscate its involvement in shipping activity, NITC set up a front company in the United Arab Emirates (UAE), Atlas Ship Management. NITC officials also arranged to create a separate UAE-based front company, Atlantic Ship Management Company, ostensibly as an entity to replace Atlas Ship Management.

## IV.   <u>SPECIFIC FACTUAL ALLEGATIONS</u>

35.     As described further herein, the Target Cargo originated from Iran and sanctioned Iranian entities.

### A.  Rima's Connection to IRGC-QF

36.     The petroleum tanker Rima is owned by Omani-company Taif Mining Services LLC ("Taif Mining"), which is a shell company owned by IRGC-QF associate Amir Dianat

("Dianat").  Both Taif Mining and Dianat have been designated by OFAC pursuant to counter-terrorism sanctions for their connection to IRGC-QF.

37.     The Rima is an Iranian-flagged vessel that is currently listed as being owned by Iranian company Moshtaq Tejarat Sanat Co (JSC) and managed by Iranian company Fanoos Savahel Kish Co (JSC) according to a commercial database which contains business registration information.  According to a publicly filed civil asset forfeiture complaint, filed on May 1, 2020, the Rima was purchased by IRGC-QF associate Amir Dianat ("Dianat") in 2019.  *See* 1:20-cv-01139.  On the same day the civil asset forfeiture complaint was filed, the Department of the Treasury designated Dianat, stating:

> The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated dual Iranian and Iraqi national Amir Dianat, a longtime associate of senior officials of Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Dianat, who is also known as Ameer Abdulazeez Jaafar Almthaje, is involved in IRGC-QF efforts to generate revenue and smuggle weapons abroad. OFAC is also designating Taif Mining Services LLC, a company owned, controlled, or directed by Dianat. Concurrent with OFAC's action, the U.S. Attorney's Office for the District of Columbia filed criminal charges against Dianat and one of his business associates for violations of sanctions and money laundering laws, and filed a related civil forfeiture action alleging that approximately $12 million is subject to forfeiture as funds involved in these crimes and as assets of a foreign terrorist organization.
> …
> Dianat, an associate of IRGC-QF officials Behnam Shahriyari and Rostam Ghasemi, has supported IRGC-QF smuggling operations for several years, including efforts aimed at the shipment of weapons including missiles. The IRGC-QF has relied on Dianat to secure entry for vessels carrying IRGC-QF shipments and has used his business connections to facilitate logistics requirements. Dianat has been directly involved in IRGC-QF efforts to smuggle shipments from Iran to Yemen.
>
> Dianat has been involved in developing additional illicit business opportunities to generate revenue for the IRGC-QF, and in 2019, leveraged Taif Mining Services LLC, a company under his control, to procure an oil tanker.
>
> Amir Dianat is being designated pursuant to E.O. 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the IRGC-QF.

> Taif Mining Services LLC is being designated pursuant to E.O. 13224, as amended, for being owned, controlled, or directed by, directly or indirectly, Amir Dianat.

*See* https://home.treasury.gov/news/press-releases/sm995

38.     I am aware that after the civil asset forfeiture complaint was filed against the funds Taif Mining used to purchase the Rima, the Rima was detained in the United Arab Emirates.  I am aware that this detention was in part based on allegations made by the Greece-based former owner of the vessel ("Greek Company 1"), since the prior company never received payment.

39.     Instead of resolving this ownership dispute in the United Arab Emirates, the Rima turned off its automatic identification system ("AIS")[2] on or about July 5, 2020, according to publicly available information, and travelled to Iran.  Maritime and commercial databases show that the Rima now flies the Iran flag and is owned by a company in Iran; however, Greek Company 1 has not notified law enforcement of their conveyance of the vessel to any company in Iran, so the only parties I am aware of that have a legal interest in the vessel are Greek Company 1 and Taif Mining.  I am unaware of Greek Company 1 ever reclaiming the Rima from Taif Mining.  As such, I believe the Rima is still being controlled by Taif Mining and Dianat.

40.     I have additionally reviewed email search warrant returns of Taif Mining and Dianat, which support that Dianat owns Taif Mining and the Rima loaded Iranian petroleum.  For

---

[2] According to MarineTraffic, which provides a commercial AIS service, the International Maritime Organization requires an AIS to be fitted on every ship, with exceptions for warships, leisure craft and fishing boats. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar. AIS automatically transmits the ship's position and a timestamp. The ship's operator may also manually update the navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.

example, a May 13, 2019 email included an "internal contract" for Taif Mining which listed Dianat and an Iranian associate as the 67% shareholder of the company.

41.     In a December 3, 2019 email, taifmsco@gmail.com, which is used by Taif Mining forwarded a Statement of Facts from a Rima shipment, which showed that the Rima travelled to Kharg Island, Iran on or about December 3, 2019.  The document additionally listed "NOR TENDERED TO NOIC [NIOC], KHARG ISLAND FOR LOADING."  I am aware from prior cases that NIOC operates many of the terminals at Kharg Island, Iran, leading me to believe that the Rima has shipped NIOC petroleum since being acquired by Taif Mining.

**B.     Rima Obtains Petroleum product at NIOC Port Kharg Island**

42.     On or about September 24, 2020, the Rima received her cargo from the M/T Stream at a Kharg Island, Iran anchorage.

43.     A confidential human source ("CHS"), who is an expert in the maritime industry and has proven reliable in the past,[3] has reviewed satellite imagery showing the ship-to-ship

---

[3]     CHS is motivated by a desire to assist the U.S. Government's foreign policy objectives. In total, the CHS has been paid $20,500 for services to law enforcement, and was reimbursed for travel expenses.

transfer between the Rima and the M/T Stream in the Kharg Island anchorage, which is shown below: [4]



44.     The CHS has reviewed satellite imagery of the Rima, which confirms that the vessel was empty before engaging in the ship to ship transfer at the Kharg Island anchorage, and fully laden thereafter.

45.     There is probable cause to believe that the Kharg Island anchorage is owned and/or controlled by NIOC, and thus that the Rima obtained NIOC petroleum product, as described further herein.

46.     Based on the CHS's understanding of the Iranian oil industry and statements of NIOC on its publicly available website, the government of Iran controls the production of Iranian oil, and specifically NIOC controls the production of crude oil in Iran.

---

[4]     Your affiant notes that, according to the CHS, oil tankers have visual signatures and can be identified by satellite imagery. Moreover, maritime vessels report their location via an Automatic Identification System ("AIS"), which includes the ship's name, IMO number, and draft depth.

47.     According to the publicly available webpage for the Iranian Oil Terminals Company ("IOTC"), IOTC is a subsidiary of NIOC that runs the Kharg Oil Terminals. Specifically, the site states that IOTC "[i]s one of the companies under umbrella of National Iranian Oil Company is an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services. This important task is under implemented by aiming at support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals . . . ." *See* http://www.iotco.ir/en/about. According to the corporation reporting service Orbis, IOTC is owned by the government of Iran.

48.     According to NIOC's website, Kharg Island is where NOIC discharges crude oil. The domain nioc-intl.ir, which purports to be NOIC's international affairs website, lists seven "active berths" at Kharg Island. According to the CHS, based on a historical review of satellite imagery, it is not uncommon for NITC vessels to engage in ship to ship transfers in the Kharg anchorage.

49.     According to the CHS, prior to Iran being sanctioned by the United States, Iran openly explained in the industry how it distributed oil and it was well-known in the industry that Kharg Island was a distribution point for NIOC.

50.     Additionally, in a separate case, Individual 1 has met with U.S. law enforcement regarding the Iranian oil trade.[5] Individual 1 is involved with the Iranian oil trade and provided

---

[5]     Information provided by Individual 1 was found to be reliable and consistent with the tradecraft of Iranian sanctions evaders. Individual 1 has been reimbursed for travel to meet with law enforcement agents and also provided $2,500 for the purpose that the same would be used to purchase computer and phone equipment on which to communicate with law enforcement.

law enforcement with information about negotiations for Iranian petroleum, which were corroborated by various emails and other source material.

51.     Individual 1 reported that the government of Iran owns all Iranian oil, and not private individuals or companies. Individual 1 also reported that NIOC is the primary government corporation involved in the production and sale of Iranian oil. According to Individual 1, NOIC owns and operates the Kharg Island oil terminals via its subsidiary, IOTC.

52.      According to NIOC's website, NIOC itself sells Iranian petroleum products directly to buyers and cautions against dealing with individuals claiming to be NIOC brokers as NIOC does not use brokers.

53.     Therefore, there is probable cause to believe that vessels calling on Kharg Island oil terminal, and berthing in its anchorage, are receiving petroleum products owned by NIOC, an OFAC sanctioned entity.  Thus, there is probable cause to believe that the Rima was loading NIOC-owned petroleum product when it obtained oil on September 24, 2020.

**C.      The Rima's Transfer to the PEGAS**

54.     According to satellite imagery reviewed by the CHS, the Rima thereafter idled south of Kharg Island for nearly a year, acting as a floating storage facility of petroleum product. The Rima maintained its position in Iran territorial waters, without moving any significant distance. According to the CHS, it is not uncommon for NIOC to use tankers as floating storage in times when petroleum product production levels are high.  The following satellite image shows the Rima idling in Iranian waters on or about October 6, 2020.



55.    The following satellite image shows the Rima idling in a nearly identical location almost a year later, on or about August 10, 2021.



56.    On or about August 17, 2021, the Rima engaged in a ship to ship transfer of crude oil with the PEGAS in Iranian territorial water. The PEGAS is a Russian flagged petroleum tanker owned by PSB Lizing OOO ("PSB Lizing") according to a commercial database of business registration information, and the Department of the Treasury designation of the same.

57.     The following satellite image shows the ship-to-ship transfer between the PEGAS and the Rima, on or about August 17, 2021:



58.     The CHS has reviewed satellite imagery of the Rima, which confirms that the vessel was empty before engaging in the ship-to-ship transfer at the Kharg Island anchorage, and laden thereafter.

59.     Based on my training and experience, I believe that a standard due diligence check on the Rima would have alerted individuals interacting with the Rima of its links to Dianat and the IRGC-QF.

60.     Law enforcement has reviewed the AIS of the PEGAS since taking on petroleum from the Rima. AIS shows that the draft changed consistent with a ship-to-ship transfer on or about August 19, 2021, as the PEGAS travelled through the Gulf of Oman.

61.     Following the ship-to-ship transfer, the PEGAS changed her AIS data to state an intended port of Kavkaz, Russia, a port on the Black Sea. AIS data shows that the PEGAS arrived at the Bosporus Canal in September 2021, was not able to proceed through the canal into the Black Sea and returned to the sea of Marmara, west of Istanbul. Although AIS data shows that the

PEGAS berthed at the Marmara OPET oil terminal in January 2022, according to the CHS's review of satellite imagery, the PEGAS did not discharge her cargo and returned to the Sea of Marmara.

62.     In April 2022, satellite imagery shows that the PEGAS was relocated to the Aegean Sea with the assistance of four Turkish tugboats. The PEGAS switched off her AIS during this time period, which I know to be contrary to standard industry practice as maritime insurers require AIS to be switched on.

63.     On or about April 13-14, 2022, satellite imagery shows that the PEGAS received assistance from a Greek-flagged offshore supply ship, which brought the PEGAS into Greek waters, where it is presently detained by Greek authorities.

64.     I am aware from information provided in this and other cases that (i) Iranian oil is frequently paid for on delivery, due to the issues created by U.S. sanctions in getting the oil to market; and (ii) oil transactions typically occur in U.S. dollars. It is reasonable to conclude that any delivery of the Rima's petroleum product will inure to the benefit of PSB Lizing, a sanctioned entity, and that such transactions may violate the aforementioned Russia Sanctions.

65.     Further, the investigation reveals the sale and delivery of crude oil from the National Iranian Oil Company ("NIOC"), and transported aboard tankers owned or operated by the National Iranian Tanker Company ("NITC"),  PSB, and others, all for the benefit of the IRGC-QF.  The Treasury Department has designated both NIOC and NITC pursuant to counter-terrorism sanctions for financially supporting the IRGC-QF. There is probable cause to believe that PSB has aided and abetted in the violation of 18 U.S.C. § 2339B.

66.     In summary, I have reviewed evidence showing that the PEGAS loaded Iranian petroleum from the Rima.  The Rima is owned by an entity that has been designated pursuant to counter-terrorism sanctions, and in turn loaded Iranian petroleum from a vessel at Kharg Island.

67.     I am unaware of any evidence showing that the PEGAS transferred this petroleum to any other port or vessel, leading me to believe that the petroleum originally acquired from the Rima is still on the PEGAS.

68.     According to publicly available sources, which I have confirmed with U.S. government officials in Greece, the PEGAS is currently in Greek territorial waters.

## V.     ALL TARGET CARGO SUBJECT TO FORFEITURE

69.     As described above, on or about August 17, 2021, and after the U.S. government designated NIOC, IRGC, IRGC-QF, Dianat, and Taif Mining pursuant to counter-terrorism authorities, the PEGAS took on cargo from the Rima.  (As described previously, the Rima currently has disputed ownership; however, the most recent party that received an unencumbered conveyance of the vessel was Taif Mining, which was designated pursuant counter-terrorism sanctions for its connection to IRGC-QF.)  The Rima transferred this cargo to the PEGAS via ship-to-ship transfer on about August 17, 2021.

70.     The Iranian petroleum transferred from the Rima to the PEGAS constitutes the Target Cargo.

71.     As described above, the Target Cargo is property of NIOC and/or Dianat and Taif Mining, which is being sold on behalf of the IRGC-QF, a designated foreign terrorist organization. In transferring the Target Cargo for the purposes of sale, NIOC and/or Dianat and Taif Mining provided or attempted to provide resources to IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

72.     The Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as an asset of NIOC and/or Dianat and Taif Mining, entities that engaged in a federal crime of terrorism – providing material support to IRGC-QF, a designated terrorist organization.

73.     Additionally, the Target Cargo provides NIOC and/or Dianat and Taif Mining with a source of influence over the IRGC-QF, within the meaning of 18 U.S.C. § 981(a)(1)(G)(i), because the Target Cargo was critical to furthering IRGC-QF's enterprise and profits.

74.     Additionally, the Target Cargo is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), because it provides the third-party companies involved with this illicit shipment a source of influence over NIOC and/or Dianat and Taif Mining, which are designated entities which have engaged in a federal crime of terrorism – providing material support to IRGC-QF, also a designated terrorist organization.

## VI.     REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

75.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Seizure Warrant. I submit that Assistant U.S. Attorney Karen Seifert, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## VII.     CONCLUSION

76.     Based on security concerns raised by the nature, ownership, and location of the Target Cargo, there exists reasonable cause to permit the execution of the requested warrant at any time of day or night.

77.     Based on the information contained herein and my training and experience, I submit

that the Target Cargo is subject to seizure and forfeiture, pursuant to the above referenced statutes,

and I request that the Court issue the proposed seizure warrants.

Respectfully submitted,

*Cindy R Burnham*

Cindy Burnham, Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 15, 2022.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA